**<u>Exhibit 2</u>**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 15 |
|  | ) |  |
| BIOSTEEL SPORTS NUTRITION INC., | ) | Case No. 23-90777 (DRJ) |
|  | ) |  |
| Debtor in a Foreign Proceeding. | ) |  |
|  | ) |  |

**DECLARATION OF SARAH S. ESKANDARI IN SUPPORT OF**
**VERIFIED PETITION FOR (I) RECOGNITION OF A FOREIGN MAIN**
**PROCEEDING, (II) RECOGNITION OF THE FOREIGN REPRESENTATIVE,**
**AND (III) RELATED RELIEF UNDER CHAPTER 15 OF THE BANKRUPTCY CODE**

I, Sarah S. Eskandari, to the best of my knowledge, information and belief, state as follows:

1.     I am the General Counsel of BioSteel Sports Nutrition Inc. (the "Foreign Debtor"). I also serve as the General Counsel for BioSteel Sports Nutrition USA LLC ("BioSteel US") and BioSteel Manufacturing LLC ("BioSteel Manufacturing" and, together with the Foreign Debtor and BioSteel US, "BioSteel"), which are not applicants in the proceedings under the *Companies' Creditors Arrangement Act* (the "CCAA" and such proceeding, the "Canadian Proceeding") but are the subject of certain limited relief requested in the Canadian Proceeding.  I have served in this position since December 2022.  As such, I have knowledge of the matters discussed herein.

2.     Prior to December 2022, I held the position of Director of Commercial Law at Canopy Growth Corporation.  I have a Bachelor of Arts in Philosophy and Political Science from University of California Irvine and a Juris Doctor from UC Law San Francisco (formerly known as University of California, Hastings College of the Law).

3.     I submit this declaration (this "Declaration") to describe the circumstances that led to the commencement of the Canadian Proceeding and this chapter 15 case, and in support of the

Foreign Representative's *Verified Petition for (I) Recognition of a Foreign Main Proceeding, (II) Recognition of the Foreign Representative, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code* (the "Verified Petition").

4.        In preparing this Declaration, I have reviewed BioSteel's records, press releases and agreements, and have relied on BioSteel's advisors and other members of BioSteel's workforce as necessary.  Where I do not possess personal knowledge, I have stated the source of my information, or believe it to be true based upon consultations with BioSteel's advisors and members of BioSteel's workforce.

> A.        **The Foreign Debtor**

5.        The Foreign Debtor is one of three affiliated entities comprising BioSteel, a sports nutrition and hydration company, focused on high quality ingredients and with a presence in professional sports markets.  BioSteel products, including ready-to-drink sports drinks ("RTDs"), hydration mixes and supplements, are available at retailers across Canada, the United States and online.

6.        The Foreign Debtor, along with BioSteel US and BioSteel Manufacturing, operate the BioSteel business.[1]  BioSteel US and BioSteel Manufacturing are Delaware limited liability companies and were created to support the expansion of the BioSteel business.  The three entities, on an integrated basis, manufacture, market and distribute BioSteel products.

7.        BioSteel made significant investments in sponsorships and endorsements, including rights to "rinkside" advertisements, use of proprietary logos, athlete-centered promotions and social media participation.  BioSteel has partnered with, among others, the

---

[1]    BioSteel US and BioSteel Manufacturing are not applicants in the Canadian Proceeding and did not file chapter 15 cases.

National Hockey League (the "NHL") and the National Hockey League Players Association (the "NHLPA"), certain National Basketball Association teams (including the Toronto Raptors), the Toronto Blue Jays and a number of professional athletes in various sports.

8.    Canopy Growth Corporation ("CGC") owns more than 90 percent of the equity interests of the Foreign Debtor and indirectly owns 100 percent of the shares of BioSteel US and BioSteel Manufacturing.

### B.    The Foreign Debtor's Property and Activities

9.    The Foreign Debtor was incorporated in Ontario on August 26, 2009 as BioSteel Sports Supplements Inc. under the Business Corporations Act (Ontario).  On October 1, 2019, the Foreign Debtor was continued under the Canada Business Corporations Act, amalgamated with 11351249 Canada Inc. (a predecessor entity that no longer exists following the amalgamation).  The Foreign Debtor's headquarters are in Canada, and the Foreign Debtor's registered office is 87 Wingold Avenue, Unit 1 in Toronto.

10.    Founded in Canada, BioSteel's packaging confirms it is a "proudly Canadian company" and, historically, the BioSteel business was conducted entirely through the Foreign Debtor.  However, in connection with an aggressive growth strategy, the business was expanded to operate through BioSteel US and BioSteel Manufacturing.  In connection therewith, the Foreign Debtor contracts with BioSteel Manufacturing and third parties for the manufacture of RTDs, "Hydration Mix" and other products pursuant to proprietary formulas owned by the Foreign Debtor.  The Foreign Debtor then sells the products directly to businesses and consumers primarily in North America, including to BioSteel US (which markets and distributes products to businesses in the United States).  The BioSteel business relies on CGC and CGC's affiliates to provide all

3

employees required to operate the BioSteel business, including, without limitation, personnel providing administrative, legal, tax and other support.

11.     Although certain BioSteel operations have expanded into the United States, (a) the majority of the Foreign Debtor's assets are located in Canada, (b) the majority of the Foreign Debtor's creditors are in the United States and Canada, and (c) Canadian or U.S. law applies to the majority of the Foreign Debtor's business and business relationships.

(1)     Products

12.     The non-commercial version of the Hydration Mix was developed in 2005 by athletes looking for a healthier sports drink.  By 2009, the Foreign Debtor was marketing its Hydration Mix for sale to professional sports teams in North America and began to gain a reputation as the hydration product of choice for high performance athletes.  BioSteel differentiates itself from competitors with a focus on nutrition and quality ingredients. BioSteel's products include:

a.     RTDs:  "Ready to Drink" 'Sports Drink' products are sugar free and gluten free, with several electrolytes.  The RTDs are packaged in an eco-friendly Tetra Pak Prisma Aseptic carton package made from renewable sources.

b.     Hydration Mix:  The powdered Hydration Mix (which is mixed with water to drink) is the Foreign Debtor's flagship product for professional sports teams. The Hydration Mix comes in eight core flavors and is available in additional "limited time" flavors.

c.     Other:  BioSteel supplements its core product lines with protein powders, sports greens and specialty nutrition powders, as well as BioSteel branded merchandise.

(2)     Production and Warehousing

13.     The Foreign Debtor owns all BioSteel intellectual property, including all rights related to the unique combination of ingredients in the quantities required to make BioSteel products and all applicable trademarks.

4

14.     I understand that until last year, the Foreign Debtor was reliant on third-party, non-affiliate contract manufacturing organizations ("CMOs") to provide processing, manufacturing, packaging and storage services.  In November 2022, BioSteel Manufacturing, with equity capital provided indirectly by 11065220 Canada Inc., a subsidiary of CGC ("1106"),[2] acquired certain manufacturing assets in Verona, Virginia from Flow Beverage Corp. ("Flow"), including the lease for the manufacturing premises (the "Facility"), five production lines and access to a warehouse pursuant to related warehouse agreement.  BioSteel Manufacturing also entered into a transition services agreement with Flow to facilitate the continued operation of the Facility.  This acquisition allowed BioSteel to bring the production of RTDs substantially "in house" and to eliminate certain underproduction penalties that had been imposed by a CMO agreement with Flow, which penalties arose when the Foreign Debtor's production volume fell below certain thresholds.  Except for certain input materials supplied by the CMOs, the Foreign Debtor owns all of the inputs into the manufacturing process and all of the semi-finished and finished products.

15.     I understand that when the Facility cannot meet BioSteel's RTD product demand, production of RTDs is supplemented through a CMO facility located in Aurora, Ontario.  The Foreign Debtor's Hydration Mix and other products are produced for the Foreign Debtor by third parties.

16.     The Foreign Debtor has also entered into agreements with third party warehousing and logistics providers in Canada and the United States, specifically in California, Colorado, Missouri, Pennsylvania, Texas and Virginia, to store finished products before they are sold and distributed.  I understand that, as of September 12, 2023, there is more than $30 million CAD of the Foreign Debtor's product, on a retail value basis, in the possession of third party warehousing

---

[2]     1106 is a subsidiary of CGC, as set forth in the organizational chart attached as Exhibit C to the Foreign Debtor's chapter 15 petition form.

and logistics providers in the United States. Certain of the third party warehousing and logistics providers in the United States have indicated an intent to exercise remedies and enforce claims against the Foreign Debtor.

(3)     Sales and Distribution

17.     BioSteel products are sold in thousands of physical stores in Canada and the United States. The primary distribution channels include food, drug and mass retailers, convenience stores, gas stations and specialty fitness retailers. The Foreign Debtor also conducts sales through online platforms such as Amazon and its own website. A small portion of BioSteel's product is also sold directly to sports teams. The Foreign Debtor was responsible for all of BioSteel's sales outside of Canada and the United States, but as of summer 2023, the Foreign Debtor began the process of deprioritizing sales outside of Canada and the United States.

18.     BioSteel has entered into sales and distribution contracts with distributors, who are, in certain cases, granted exclusive control over specific territories, as well as large retailers.

19.     I understand that, in connection with BioSteel's expansion into the United States, an affiliate of CGC formed BioSteel US in 2020. Since its formation, BioSteel US has entered into distribution agreements and retail sale agreements for the sale of BioSteel products to businesses in the United States. BioSteel US fulfills business customer purchase orders by way of a supply and distribution agreement between the Foreign Debtor and BioSteel US. Pursuant to that agreement, the Foreign Debtor provides all order processing, shipping and billing services and BioSteel US acquires title immediately before the sale to its customer. The terms of BioSteel US's agreement with the Foreign Debtor provide that the Foreign Debtor will accept returns of product sold by BioSteel US, and therefore, such returns are delivered to, and processed by, the Foreign Debtor.

(4)    <u>Sponsorship and Marketing</u>[3]

20.    BioSteel has successfully leveraged its connections with professional athletes and sports organizations into endorsement and marketing opportunities and has historically focused a significant portion of its marketing spend on athlete endorsements.

21.    I understand that the Sponsorship Agreements were generally entered into by the Foreign Debtor; however, once formed, BioSteel US also entered into certain of these agreements. The Foreign Debtor has entered into agreements with professional sports teams such as the Toronto Raptors, athletic organizations such as the NHL and the NHLPA, and individual professional athletes.  These Sponsorship Agreements provide for, among other things, sponsored posts on athletes' social media accounts, athlete appearances in marketing campaigns, in-game and in-arena branding and the rights to use certain trademarks, including logos, in advertising campaigns.

22.    BioSteel's Sponsorship Agreement with the NHL and NHLPA is the business's most significant sponsorship commitment.  Both the Foreign Debtor and BioSteel US have signed the Sponsorship Agreement with the NHL and NHLPA, as well as certain related agreements for the services of specific NHL players.  Pursuant to the terms of the NHL Sponsorship Agreement, BioSteel, among other things, gains the right to:  (a) use NHL and NHLPA trademarks (such as the NHL name and shield logo); (b) camera-visible rinkside marketing of the BioSteel brand during the NHL regular season and playoffs through multimedia broadcasts of games (including television); and (c) the representation by the NHL that BioSteel is the "Official Hydration Partner of the NHL and NHLPA" for a term of eight (8) years, ending in June 2030.  I understand that the most recent payment under the NHL Sponsorship Agreement was due on September 1, 2023. BioSteel did not remit the payment to the NHL when due.

---

[3]    BioSteel's sponsorship and endorsement contracts described herein and in the Verified Petition are collectively referred to as the "<u>Sponsorship Agreements</u>."

23.     I understand that BioSteel also has product placement and other marketing agreements with sports agencies, health clubs/gyms and sports arenas.  Among other things, these agreements provide for BioSteel product placement or exclusive placement in facilities and the use of BioSteel products in various types of media.  In addition, BioSteel also enters into traditional promotion and marketing contracts with retailers, offering discounts, incentives for improved in-store placement and rebates for volume purchases.

24.     I understand that given the Foreign Debtor's financial distress and the lack of revenue driven by certain of these Sponsorship Agreements, the Foreign Debtor (and where applicable, BioSteel US) ceased making certain payments under the Sponsorship Agreements starting in the spring of 2023.  Certain of the counterparties have delivered notices of default and/or termination.

25.     I understand that the estimated upcoming payments that are scheduled to come due under the Sponsorship Agreements between October 1, 2023 and March 31, 2024 total approximately $12 million CAD in the aggregate (excluding amounts that are already past due). The Foreign Debtor does not intend to use the services of the counterparties on a go-forward basis and does not intend to make the upcoming payments due under the contracts.  Consequently, the Foreign Debtor faces a real risk that contract counterparties, including those counterparties in the United States, may pursue and try to enforce a judgment against the Foreign Debtor and/or its assets.

26.     To the extent that a potential buyer in the anticipated SISP (as defined below), if approved, wishes to acquire BioSteel's rights under any of the Sponsorship Agreements, the Foreign Debtor intends to work with the applicable counterparties to arrive at proposed cure amounts or other negotiated resolutions in order to transition any Sponsorship Agreements.

(5)     Intellectual Property

27.     The Foreign Debtor is the owner of all intellectual property that is material to the BioSteel business, including the proprietary formulas and other information related to the production of the RTDs, Hydration Mix and powders.

28.     The Foreign Debtor is the owner and exclusive licensor of over a dozen trademarks (both registered and unregistered) in Canada and the United States, which include marketing campaign slogans, iterations of BioSteel's corporate name and artistic designs based upon BioSteel's corporate name. The Foreign Debtor has also registered some of its trademarks outside of Canada. The Foreign Debtor has no registered patents.

(6)     Regulatory Matters

29.     In Canada, BioSteel is regulated under the Food and Drugs Act (Canada), as RTDs are considered "food" under the definition in that Act. The Hydration Mix and powders are considered "Natural Health Products" and are governed by the Natural Health Product Regulations under the Food and Drugs Act. In the United States, BioSteel is regulated by the U.S. Food and Drug Administration and certain state-level regulations.

30.     BioSteel has registered its brands that use naturally occurring substances (characterized as medicinal or non-medicinal) with the Natural and Non-Prescription Health Products Directorate of Canada, an agency of Health Canada (the department of the Canadian government responsible for national health policy). The Foreign Debtor is a site license holder from Health Canada, which gives the Foreign Debtor the authorization to manufacture, package, label and/or import natural health products. The Foreign Debtor also holds a Safe Food for Canadians License from the Canadian Food Inspection Agency, which grants the Foreign Debtor the authority to, among other things, mix raw inputs for the manufacture of BioSteel products and package BioSteel products for export.

9

(7)    Employees

31.    I understand that until the co-founder's recent departure from BioSteel to form part of a potential bidding consortium, the co-founder was the only employee of the Foreign Debtor. All other personnel providing services to BioSteel are employees of CGC or Canopy Growth USA, LLC, an indirect, wholly-owned subsidiary of CGC ("Canopy USA").  The people who actually manage the Foreign Debtor are located in Canada.  CGC or Canopy USA, as applicable, pays the employees directly and remits all applicable deductions.  Pursuant to master services agreements, CGC or Canopy USA, as applicable, charges the applicable BioSteel entity for the employee-related costs.  BioSteel has significant outstanding obligations to CGC and Canopy USA for employee-related costs for the period from March 2023 through the date hereof.  I understand that CGC has continued to pay the employees and remit deductions.

32.    I understand that for August 2023, the aggregate monthly cost for employees was approximately $1.7 million CAD and approximately 190 employees provided services to BioSteel on a full-time basis.  Of these employees, approximately 90 were providing services at the Facility. The balance of the employees worked in sales, marketing and other corporate capacities.

33.    CGC has provided notice to the Foreign Debtor that CGC and Canopy USA intend to terminate or make unavailable to the Foreign Debtor most of those employees who were previously dedicated to BioSteel.  CGC has agreed to provide BioSteel with a limited number of its employees to provide certain necessary continuing services, including to assist in the SISP, if approved.

(8)    Lease Obligations

34.    The Foreign Debtor is the tenant under a lease, dated March 2, 2018, as amended, for office space at 87 Wingold Avenue, Unit 1 in Toronto, with 87 WG Corp. as the owner of the leased property.  The Foreign Debtor has a net monthly rent obligation of $21,000.00 CAD.

35.     In connection with the acquisition of the Facility, BioSteel Manufacturing acquired the deed of lease for real property located at 33 Lake View Court, Verona, Virginia.  The Foreign Debtor is not the tenant under the lease agreement, but it owns certain of the goods in the Facility.

(9)     Tax Matters

36.     I understand that the Foreign Debtor remits federal goods and services taxes and harmonized sales taxes in Canada ("GST/HST") on a monthly basis.  I understand that depending on the sales and purchases in a specific month, the monthly remittances over the past year have varied from approximately $700,000 CAD being payable to a refund of approximately $260,000 CAD.  I understand that the Foreign Debtor is registered for sales and local tax purposes in certain states within the United States, with sales tax obligations of the Foreign Debtor on a quarterly basis estimated at approximately $6,000.00, but which vary based upon sales.

37.     While BioSteel currently has no employees, it has one former employee on salary continuation and therefore remits payroll and source deductions in Canada for such former employee.

**C.     Litigation**

38.     In the ordinary course of business, BioSteel is involved in litigation regarding, among other things, contract disputes and consumer protection matters.

39.     In particular, and based on my review of the relevant filings in the case, the Foreign Debtor is the defendant in a putative consumer class action filed in the United States District Court for the Eastern District of New York, on January 27, 2023, by plaintiff Laura Bedson on behalf of all consumers who purchased BioSteel RTDs in the Blue Raspberry, Peach Mango, White Freeze, Mixed Berry and Rainbow Twist flavors.  My understanding is that the complaint alleges:  (a) the Foreign Debtor misled consumers in its marketing of the RTDs under applicable New York law and (b) BioSteel's RTD products contain per- and polyfluoralkyl substances known as "PFAS."

11

The Foreign Debtor moved to dismiss the complaint, and the plaintiff has refiled an amended complaint, which the Foreign Debtor has further sought to dismiss pursuant to rules 12(b)(6) and 12(b)(1) of the Federal Rules of Civil Procedure.

40.     Additionally, in the ordinary course of the Foreign Debtor's business, certain other parties have threatened litigation against the Foreign Debtor.

### D. The Foreign Debtor's Capital Structure, Cash Management System and Intercompany Obligations

#### (1) Secured Indebtedness

41.     I understand that since 2019, the Foreign Debtor's operations have been funded, in large part, by a secured loan and a credit facility (the "Secured Financing Facility"). Specifically, the Foreign Debtor entered into the tenth amended and restated loan agreement (the "BioSteel Loan Agreement"), dated as of July 13, 2023, among the Foreign Debtor, as borrower, CGC and 1106, each as a lender (together, the "Lenders") and CGC, in its capacity as agent for and on behalf of the Lenders (in such capacity, the "Agent"). I understand that the previous amendments and restatements to the BioSteel Loan Agreement have, among other things, increased the size and/or added additional tranches of funding available as part of a revolving facility and provided the Foreign Debtor with the ability to borrow in U.S. dollars.

42.     Pursuant to the BioSteel Loan Agreement, the Lenders established the Secured Financing Facility in favor of the Foreign Debtor. The Secured Financing Facility is comprised of the following tranches:

a.     A non-revolving tranche with a maximum amount of $4,500,000 CAD ("Tranche A");

b.     A revolving tranche with a maximum amount of $15,000,000 CAD ("Tranche B");

c.     A revolving tranche with a maximum amount of $60,000,000 CAD ("Tranche C");

d.    A revolving tranche with a maximum amount of $70,000,000 CAD ("<u>Tranche D</u>");

e.    A revolving tranche with a maximum amount of $200,000,000 CAD ("<u>Tranche E</u>"); and

f.    A revolving tranche with a maximum amount of $40,000,000 CAD ("<u>Tranche F</u>" and together with Tranche B, Tranche C, Tranche D and Tranche E, the "<u>Other Tranches</u>").

Under the terms of the BioSteel Loan Agreement, Tranche A is a non-revolving loan facility and amounts repaid thereunder cannot be reborrowed.  The Other Tranches comprise revolving loan facilities and any amount advanced thereunder can be advanced again following its repayment. Interest that accrued and continues to accrue on the amounts owing under the Secured Financing Facility, which is to be paid quarterly in arrears, was historically paid through incremental quarterly draws on the Secured Financing Facility.  I understand that, however, no payments have been made in respect of interest that has accrued after December 31, 2022.

43.    The obligations of the Foreign Debtor under the BioSteel Loan Agreement are secured by a tenth amended and restated general security agreement dated as of July 13, 2023 (the "<u>Security Agreement</u>").  Pursuant to the Security Agreement, the Foreign Debtor granted to the Agent, for its own benefit and as agent for each of the Lenders, a security interest in all right, title and interest in and to all real and personal property that is or hereafter owned by the Foreign Debtor or in which the Foreign Debtor has or hereafter acquires any interest or rights of any nature whatsoever, subject to customary limited exclusions.

44.    I understand that as of July 31, 2023, the Foreign Debtor owed CGC the principal amount of $69,729,929.65 CAD, plus accrued and unpaid interest of $5,122,161.77 CAD and owed 1106 the principal amount of $218,452,976.56, plus accrued and unpaid interest of $16,336,604.82.

(2)     Unsecured Indebtedness

45.     I understand that in addition to approximately $4.6 million CAD owing to CGC and its affiliates on an unsecured basis, the Foreign Debtor has unsecured trade liabilities of approximately $40.4 million CAD related to, among other things, the Sponsorship Agreements, marketing costs, warehousing, storage and materials supplied to CMOs for production.

(3)     Cash Management and Intercompany Transfers

46.     I understand that the Foreign Debtor maintains four bank accounts (two at Royal Bank of Canada ("RBC"), one at TD Bank and one at M&T Bank).  I understand that all of the accounts are in Toronto other than the M&T Bank account in the United States.  I understand that the Foreign Debtor also has a deposit invested in a guaranteed investment certificate with RBC in the amount of $68,750.00 CAD, which is used to support the Foreign Debtor's credit cards and in respect of which RBC has also registered a lien.  The Foreign Debtor also has an interest in certain funds deposited with its U.S. Counsel, Akin Gump Strauss Hauer & Feld LLP, held on account in Houston, Texas, as an undrawn retainer for services.

47.     BioSteel's collective operations are funded by advances under the BioSteel Loan Agreement to the Foreign Debtor.  I understand that, in the ordinary course of business, the Foreign Debtor engages in intercompany transactions with BioSteel US and BioSteel Manufacturing, and BioSteel US's and BioSteel Manufacturing's sources of cash are in large part directly or indirectly dependent upon the continued operation of the Foreign Debtor.

(4)     Intercompany Services

48.     The Foreign Debtor and CGC are parties to a master services agreement, which, *inter alia*, permits CGC to provide services to the Foreign Debtor on an as-needed basis, if and when requested, subject to the ability of CGC to refuse (by written notice) to provide any services. The services covered under the master services agreement relate to all business functions,

14

including operations, supply chain, finance, human resources, legal, information technology, research and development, tax, treasury, corporate development, facilities, marketing and sales and corporate communications. I understand that the agreement provides that the Foreign Debtor will reimburse third party costs incurred by CGC in the provision of services, and the Foreign Debtor is charged cost plus a markup necessary to ensure CGC earns an arm's-length return for services.

49. Each of BioSteel US and BioSteel Manufacturing is party to a master services agreement with Canopy USA, which mirrors the construct of the Foreign Debtor's master services agreement with CGC.

### E. The BioSteel Review

50. I understand that in connection with the preparation of CGC's consolidated financial statements for the fiscal year ended March 31, 2023, CGC identified certain trends in the recording of sales by BioSteel and began an internal review (the "BioSteel Review"). I understand that through the BioSteel Review, CGC identified misstatements, primarily overstatements, related to the recognition of revenue, primarily related to the Foreign Debtor's business-to-business sales in markets outside of Canada and the United States.

51. I understand that, as a result of the BioSteel Review, CGC restated its consolidated financial statements. I understand that all individuals implicated in the revenue misstatements are no longer involved with BioSteel (other than certain individuals in their capacities as minority shareholders) and an independent director was later added to the board of directors of each of the BioSteel entities. I understand that BioSteel continues to evaluate its claims against the former members of BioSteel's management in connection with the information uncovered during the BioSteel Review.

F.      **Response to Financial Difficulties**

52.      I understand that, at the end of 2022, BioSteel retained Goldman Sachs & Co. LLC ("Goldman") to conduct a broad marketing process to identify a sale or investment opportunity that would allow BioSteel to continue as a going concern, with or without CGC's involvement.

53.      I understand that due to concerns identified regarding BioSteel's financial reporting (as discussed above), the sales process stalled during the BioSteel Review, and BioSteel re-examined the size of the investment required to grow the business.  I understand that the sales process was restarted in June 2023 with the benefit of refined financial information.

54.      I understand that by July 2023, Goldman had engaged with twenty-four potential buyers, of which sixteen entered into non-disclosure agreements, four were granted access to the BioSteel virtual data room and three participated in management calls.  I understand that no indications of interest or bids were received by the beginning of August 2023.

55.      In August 2023, after being advised that certain members of management were considering a management buy-out offer, a special committee of the Foreign Debtor (the "Special Committee") was formed to explore strategic alternatives for the Foreign Debtor.  Shortly thereafter, the relevant members of management resigned to focus their efforts on an offer.

56.      The Special Committee retained Greenhill & Co. Canada Ltd. ("Greenhill") to explore alternative strategies to maximize the value of the BioSteel brand.  Greenhill designed and launched a refreshed marketing process to identify proposals for a transaction or investment in BioSteel.  Greenhill contacted the parties who had previously been contacted in Goldman's process, along with other industry and financial parties.  Greenhill's process letter established September 5, 2023 as the deadline to submit proposals.  During Greenhill's process, twenty parties executed NDAs, and eighteen were granted access to the virtual data room and undertook diligence.

16

57.     On September 5, 2023, six preliminary, non-binding proposals were received. However, all of the proposals were highly conditional and required significant time to complete, among other things, due diligence before the parties could make a determination about whether to submit a binding bid.  Importantly, none of the parties that submitted proposals fully committed to providing the financing necessary to meet BioSteel's immediate operating needs through the completion of their respective diligence periods.

58.     On September 13, 2023, CGC informed the Foreign Debtor that neither it nor its affiliates intended to make any further cash or shared services investment in BioSteel's business and at the same time, CGC demanded repayment under the Secured Financing Facility.  Without ongoing financial and services support from CGC or its affiliates, the Foreign Debtor cannot meet its obligations as they come due.  As a result, the Special Committee determined that it was in the Foreign Debtor's best interest to conserve cash, put the business into hibernation and seek protection under the CCAA to allow the Foreign Debtor to maximize value for stakeholders through a court-supervised sales process and to seek recognition of that CCAA proceeding in the United States.

59.     As a result, the Special Committee determined that commencing the Canadian Proceeding and this chapter 15 case would provide the best opportunity to maximize the value of BioSteel for all stakeholders.

**G.     The Canadian Proceeding**

60.     On September 14, 2023, the Foreign Debtor commenced the Canadian Proceeding in the Canadian Court pursuant to the CCAA.  I am informed by the Foreign Representative's Canadian counsel that (a) the CCAA is a Canadian law that allows insolvent corporations to restructure their business and financial affairs, and (b) all CCAA proceedings are carried out under the supervision and control of a Canadian court that appoints a monitor to oversee the applicant's

business and financial affairs and submit reports to the Canadian court.  Additionally, I am informed by Canadian counsel that the Canadian Proceeding is collective in nature and will take into account the rights of the Foreign Debtor's various stakeholders and creditors and is intended to benefit creditors and shareholders collectively.

61.     The Foreign Debtor commenced the CCAA Proceeding with the anticipation of building on the extensive sale processes conducted over the past several months to identify the best and highest offer for the Foreign Debtor's assets through a sale and investment solicitation process (the "SISP").  The Canadian Court will consider whether to approve the SISP at the comeback hearing scheduled for September 21, 2023.

62.     On September 14, 2023, the Canadian Court entered an order (as may be amended or amended and restated, the "CCAA Order"), which expressly authorized the Foreign Representative to seek recognition of the Canadian Proceeding in the United States to aid and assist the Canadian Court in carrying out the terms of the CCAA Order.  Additionally, the CCAA Order approves, among other things:

> a.     a stay of all proceedings and remedies taken or that may be taken in respect of any of the BioSteel entities or affecting the Foreign Debtor's business and future assets, undertakings and property (the "Stay of Proceedings"); and
>
> b.     the Foreign Debtor acting as the Foreign Representative for purposes of having the Canadian Proceeding recognized in the United States.

At the comeback hearing, the Foreign Debtor will seek entry of (i) an order approving a SISP for BioSteel and (ii) an amended and restated CCAA Order that, among other things, extends the Stay of Proceedings approved in the CCAA Order.

63.     The Foreign Debtor commenced this chapter 15 case to facilitate the fair and efficient administration of the Canadian Proceeding and protect and maximize the value the Foreign Debtor's assets.  Specifically, this chapter 15 case will help provide the Foreign Debtor

with the breathing room and protection necessary to build off its prepetition marketing process through the anticipated SISP.  In connection therewith, the Foreign Representative is seeking, on an emergency basis, the protection of a stay in the United States, for the benefit of the Foreign Debtor and its assets within the U.S., to give the anticipated SISP the best opportunity to be successful.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information and belief.

Dated: September 17, 2023

*/s/ Sarah S.* Eskandari

Sarah S. Eskandari
General Counsel
BioSteel Sports Nutrition Inc.